UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MAURICE HENRY POLLOCK,<br><br>                    Petitioner,<br><br>     v.<br><br>MICHAEL OBENLAND,<br><br>                    Respondent. | Case No. C17-1884-MJP-MAT<br><br>REPORT AND RECOMMENDATION |

INTRODUCTION AND SUMMARY CONCLUSION

This is a federal habeas action proceeding under 28 U.S.C. § 2254. Petitioner Maurice Pollock seeks to challenge in this action a 2013 judgment of the King County Superior Court. Pursuant to this Court's directive, respondent filed an answer responding to only one of the four claims asserted by petitioner in his amended petition for writ of habeas corpus, and he also submitted relevant portions of the state court record. Petitioner filed a response to respondent's answer. Petitioner also filed a motion for appointment of counsel in this matter which the Court will address herein.

This Court, having reviewed petitioner's amended petition, petitioner's motion for appointment of counsel, all briefing of the parties, and the balance of the record, concludes that

REPORT AND RECOMMENDATION
PAGE - 1

petitioner's amended petition should be denied and this action should be dismissed with prejudice. This Court also concludes that petitioner's motion for appointment of counsel should be denied.

FACTS

The Washington Court of Appeals, on direct appeal, summarized the facts of petitioner's crime, and relevant testimony presented at trial, as follows:

> On November 19, 2010, Nigel Greer lived with his fiancée Annaka Lain and their two young children in apartment 73 at the Sunset Vista Apartments in Renton.[1] At about 10:00 a.m., Greer walked downstairs from his apartment to pick up his mail.
>
> After walking back upstairs, Greer encountered Brandon Wolfe, who lived two doors away in apartment 75.[2] Wolf was a casual acquaintance who had purchased marijuana from Greer on several occasions. According to Greer, prior conversations between the two involved nothing more than "what weed, what kind of weed I had or if he wanted to purchase some or whatever."[3]
>
> As Greer walked by, Wolfe asked if Greer knew his friend "Moe." Wolf indicated that "Moe" had been selling marijuana in the area for a long time and had "the spot sewed up."[4] Greer expressed a lack of interest in the message that Wolfe appeared to be conveying.
>
> Upon returning to his apartment, Greer watched television while Lain slept in the bedroom with the couple's infant son. Suddenly, Greer heard a "loud bang" on the door and someone yelled "Police, open up."[5] Acknowledging that he was paranoid "because I have got some weed in my house,"[6] Greer looked through the peephole on the door, but could see nothing at first. At some point, Lain came out of the bedroom and stood near Greer.
>
> After a short time, Greer was able to see through the peephole, but saw no

---

[1] This is incorrect. According to the testimony presented at trial, Mr. Greer lived in apartment 75 at the Sunset Vista Apartments, not apartment 73. (*See* Dkt. 20, Ex. 39 at 33.)

[2] This is also incorrect. The testimony presented at trial made clear that Mr. Wolfe lived in apartment 73, not apartment 75. (*See id.*, Ex. 42 at 125.)

[3] [Court of Appeals footnote 1] Report of Proceedings (September 11, 2013) at 31.

[4] [Court of Appeals footnote 2] Id. at 34.

[5] [Court of Appeals footnote 3] Id. at 38-39.

[6] [Court of Appeals footnote 4] Id. at 39.

REPORT AND RECOMMENDATION
PAGE - 2

one outside. When Greer opened the door, he saw Wolfe and a man he identified as Pollock nearby. Pollock was holding a handgun and ranting about a prior robbery incident in which he had been shot. Greer moved just outside the door to block Pollock's entry. In the meantime, Lain armed herself with one of her handguns. At some point Pollock pointed his handgun at Greer's head and said "I hate fucking niggers."[7]

Greer put his hands up and stepped back into the apartment as "all hell broke loose."[8] Greer heard about 20 to 25 shots fired in rapid succession. Greer believed that Lain had hit Pollock, who quickly retreated, firing wildly. Wolfe had started firing as well.

Greer acknowledged that he had a 2009 conviction for witness tampering and was not allowed to possess a firearm. He denied that he had held or fired a gun or that he or Lain had pursued the assailants beyond the alcove just outside his apartment door. Greer recalled that Pollock had a handgun during the confrontation, but claimed he did not see Pollock carrying a shotgun or "anything . . . wrapped up."[9]

Lain testified that she was awakened by pounding on the apartment door. On her way to the living area, she placed her infant son on a sofa. Lain heard someone at the door yelling "Police. Search warrant. Open the door."[10]

When Greer opened the door, Lain saw a man carrying "like a rifle or something wrapped in his shirt."[11] The man was standing just inside of the apartment as Greer tried to calm him down and back him out. Lain later saw a second man standing behind the intruder.

Lain retrieved her .45 caliber handgun from a backpack and stood near Greer. The intruder became increasingly aggressive and eventually pulled out a handgun, held it to Greer's head, and uttered a racial slur. Thinking that the man was going to kill Greer, Lain opened fire, emptying her gun:

> All I remember was shooting. I just started pulling the trigger. I just – as fast as I could, and both of them started pulling their trigger as fast as they could.[12]

---

[7] [Court of Appeals footnote 5] Id. at 46

[8] [Court of Appeals footnote 6] Id. at 47.

[9] [Court of Appeals footnote 7] Id. at 44.

[10] [Court of Appeals footnote 8] Id. at 86.

[11] [Court of Appeals footnote 9] Id. at 88.

[12] [Court of Appeals footnote 10] Id. at 111-12.

REPORT AND RECOMMENDATION
PAGE - 3

One of the bullets went through Lain's shorts, but she was otherwise uninjured. Lain then scrambled along the floor to grab her 9 mm handgun and resumed shooting. Lain and Greer eventually closed the apartment door and called 911.

Pollock and Wolfe gave different accounts of the confrontation.[13]

Wolfe testified that on the day before the confrontation, he was returning to his apartment when he encountered Greer. Greer, who had previously sold marijuana to Wolfe, seemed upset. As Wolfe walked by, Greer appeared to be "dry-firing"[14] a pistol in the pocket of his sweatshirt, which Wolfe believed was some kind of warning.

On the following morning, a neighbor asked Wolfe for some marijuana. Wolfe reluctantly sold him a "dime bag," but just as a one-time "favor."[15]

A short time later, Wolfe heard a loud "bang" at his door. Through the peephole, Wolfe saw Greer and another man standing outside. Both men looked intimidating, and Wolfe stepped outside to talk to them.

Greer informed Wolfe that he was not allowed to sell marijuana "on my tier."[16] Wolfe acknowledged his understanding and apologized profusely. Wolfe admitted, however, that he also told Greer, "I have a gun and I will defend myself."[17] Greer and the other man left and Wolfe went back inside. Wolfe then called Pollock, a close friend, to arrange for "something that I would be able to protect myself with."[18]

A short time later, Pollock arrived at Wolfe's apartment with an AK-47 assault rifle, a shotgun loaded with "beanbags,"[19] and two .357 revolvers. Pollock was wearing a bullet proof vest.[20] After bringing the weapons into the apartment, Pollock showed Wolfe how to use them.

Wolfe followed Pollock over to Greer's apartment, where Pollock knocked

---

[13] [Court of Appeals footnote 11] Prior to trial, Wolfe pleaded guilty to two counts of second degree assault.

[14] [Court of Appeals footnote 12] Report of Proceedings (Sept. 17, 2013) at 78.

[15] [Court of Appeals footnote 13] Id. at 79.

[16] [Court of Appeals footnote 14] Id. at 82.

[17] [Court of Appeals footnote 15] Id. at 112.

[18] [Court of Appeals footnote 16] Id. at 84.

[19] [Court of Appeals footnote 17] Id. at 15.

[20] [Court of Appeals footnote 18] Id. at 16.

REPORT AND RECOMMENDATION
PAGE - 4

on the door and yelled "police." Both Pollock and Wolfe were armed with Pollock's handguns. Pollock was also carrying the shotgun, wrapped in a blanket. Wolfe heard someone shouting inside, but no one opened the door. Pollock shouted "Leave my brother and his family alone"[21] through the door, and the two returned to Wolfe's apartment. In a statement to police, Wolfe said that he and Pollock had gone over to Greer's apartment to "intimidate" him.[22]

Wolfe insisted on taking his family to Pollock's house and made preparations to leave. As Wolfe followed Pollock out the door, he saw Greer, who was "yelling and cussing and stuff."[23] Pollock walked up to Greer and made a racial slur. In the ensuing shooting, Wolfe was hit in the chest and leg and fell to the ground. Greer retreated and resumed shooting from behind a wall near his apartment. Wolfe emptied his gun into the wall, hoping to stop Greer.

When the shooting stopped, Pollock helped Wolfe back into his apartment and left. Wolfe told the 911 operator that Greer had shot him. Wolfe acknowledged that he might have told a paramedic that Greer had come into the apartment and fired a shot. Wolfe did not see Lain in the confrontation.

Pollock testified that Wolfe called him on November 19, 2010, and said he was terrified for the safety of his family. Pollock responded by bringing Wolfe "a form of protection" that had saved Pollock's life in the past:

> The only reason my life was saved wasn't because I had a gun . . . it
> was because I had a big, scary, loud gun.[24]

Pollock knew that Wolfe had been selling some of the marijuana that Pollock gave him.

Pollock informed Wolfe that they were going over to talk to Greer and "tell them to just leave you alone."[25] Pollock armed himself with a concealed pistol and carried the shotgun wrapped in a blanket. Pollock, followed by Wolfe, walked over to Greer's apartment. When Pollock knocked, he heard "guns click"[26] and jumped back. Pollock shouted "Police. We know you have guns" and then "Leave my little brother and his family alone."[27]

---

[21] [Court of Appeals footnote 19] Id. at 91.

[22] [Court of Appeals footnote 20] Id. at 133.

[23] [Court of Appeals footnote 21] Id. at 94.

[24] [Court of Appeals footnote 22] Id. at 14.

[25] [Court of Appeals footnote 23] Id. at 16.

[26] [Court of Appeals footnote 24] Id. at 17.

[27] [Court of Appeals footnote 25] Id.

REPORT AND RECOMMENDATION
PAGE - 5

When there was no response, Pollock and Wolfe started back toward Wolfe's apartment. As the two approached Wolfe's apartment, Greer appeared with a gun in his waistband. Pollock told Greer not to pull out the gun. When Greer started to reach for the gun, Pollock pulled the blanket off the shotgun. Greer jumped behind a wall.

In his statement to police after the shooting, Pollock said that he "move[d] towards [Greer] with the shotgun aimed, loaded with beanbags"[28] and that Greer turned and ran back through the open door of his apartment. At trial, Pollock explained that he pulled the blanket off the shotgun, but did not aim it directly at Greer. While Pollock pulled the blanket off, Greer jumped behind the wall and said, "Don't pull that gun. I have been shot. I don't want to be shot again."[29]

Pollock claimed that he then walked toward the wall, peeked around the corner, and asked Greer to leave Wolfe and his family alone. He and Wolfe then returned to Wolfe's apartment.

Pollock decided that Wolfe and his family should get away from the apartment. Pollock and Wolfe walked out the door, armed with the handguns. The shotgun and assault rifle remained in the apartment. As Pollock and Wolfe exited the apartment, Greer stood nearby with his hand on a gun, screaming and acting aggressively. Pollock repeatedly told Greer to leave Wolfe and his family alone. Pollock acknowledged that when Greer did not respond, he turned to Wolfe and made and "ignorant stupid" racial slur.[30] Pollock saw Lain standing behind Greer.

Pollock maintained that he was immediately hit by a bullet in the chest. As Pollock ran, another bullet hit him in the hand. Pollock then pulled out his handgun and returned fire. Greer hid behind a wall and continued firing. Pollock managed to return to Wolfe's apartment and grab the assault rifle. He then went outside and saw several members of what he believed to be Greer's "gang."[31]

By this time, the shooting had stopped. Pollock helped a wounded Wolfe back into his apartment. Pollock then left and drove himself to the hospital.

Based on the physical evidence, including blood drops, bullet casings and bullet strikes, police investigators concluded that the gunfight had occurred "around or just outside, or just inside the door"[32] to Greer's apartment, rather than farther

---

[28] [Court of Appeals footnote 26] Ex. 13, at 6.

[29] [Court of Appeals footnote 27] Report of Proceedings (Sept. 17, 2013) at 53-54.

[30] [Court of Appeals footnote 28] Id. at 26.

[31] [Court of Appeals footnote 29] Id. at 31.

[32] [Court of Appeals footnote 30] Report of Proceedings (Sept. 16, 2013) at 31.

REPORT AND RECOMMENDATION
PAGE - 6

down the walkway toward Wolfe's apartment. Kim Duddy, the defense's forensic expert, testified that the evidence indicated that no weapons were fired out of or into Greer's apartment, and that the shooting occurred near the alcove outside of Greer's apartment.

The State charged Pollock with separate counts of assault in the first degree against Greer and Lain. Both counts alleged that Pollock was armed with a firearm.

A short time after the incident, Pollock approached the police and asked to provide his account of the events. In the recorded interview, Pollock acknowledged that he brought the weapons to Wolfe's apartment, attempted to contact Greer at his apartment, and directed a racial slur at Greer. He maintained that he had acted only in self-defense after Greer opened fire. After a CrR 3.5 hearing, the trial court ruled that Pollock's statements were admissible.

The jury acquitted Pollock of both counts of assault in the first degree and found him guilty of a single count of the lesser offense of assault in the second degree for assaulting Greer with a firearm. Following the verdict, Pollock moved to arrest judgment, arguing that the evidence was insufficient and that the State failed to establish the corpus delecti. The court denied the motion and imposed a 39-month standard range sentence, including firearm enhancement.

(Dkt. 20, Ex. 2 at 1-10.)

## PROCEDURAL HISTORY

Petitioner appealed his judgment and sentence to the Washington Court of Appeals, arguing that there was insufficient evidence to support his conviction, that the trial court's reasonable doubt instruction was erroneous, and that defense counsel's performance was constitutionally deficient. (*See* Dkt. 20, Exs. 2-3, 6-8.) On July 20, 2015, the Court of Appeals issued an unpublished opinion affirming petitioner's conviction. (*Id.*, Ex. 2.) Petitioner moved for reconsideration of the Court of Appeals' opinion, and that motion was denied. (*See id.*, Exs. 9-10.) Petitioner thereafter filed a petition for review in the Washington Supreme Court, and the petition was denied without comment on March 2, 2016. (*Id.*, Exs. 11-12.) Petitioner next filed a *pro se* motion for reconsideration of the Washington Supreme Court's decision terminating review, but the Supreme Court took no action on the motion because an order denying a petition for review

REPORT AND RECOMMENDATION
PAGE - 7

is not subject to reconsideration. (*Id*., Exs. 13-15.) The Court of Appeals issued its mandate terminating direct review on March 25, 2016. (*Id*., Ex. 16.)

On May 31, 2016, petitioner filed a personal restraint petition in the Washington Court of Appeals in which he asserted that both his trial counsel and his appellate counsel had rendered ineffective assistance. (*Id*., Ex. 17.) The Court of Appeals dismissed the petition on April 25, 2017. (*Id*., Ex. 20.) Petitioner did not seek further review by the Washington Supreme Court, and the Court of Appeals issued a certificate of finality on June 9, 2017. (*Id*., Ex. 21.)

On December 14, 2016, petitioner filed a motion for relief from judgment in the King County Superior Court in which he asked that his judgment and sentence be modified to eliminate references to crimes of which he was not convicted. (*Id*., Ex. 22.) The Superior Court transferred petitioner's motion to the Washington Court of Appeals for consideration as a personal restraint petition and the Court of Appeals, in turn, transferred the petition to the Washington Supreme Court. (Dkt. 20, Exs. 24, 25.) The Supreme Court dismissed the petition on August 9, 2017, and issued a certificate of finality on October 16, 2017. (*Id*., Exs. 26, 27.)

On February 10, 2017, petitioner filed a second motion for relief from judgment in the King County Superior Court. (*Id*., Ex. 28.) Petitioner asserted therein that the state knowingly presented perjured testimony, that his trial and appellate counsel were ineffective, that he was deprived of a unanimous verdict because the jury failed to specify the act upon which it relied to support petitioner's assault conviction, and that he had newly discovered evidence of perjury. (*See id*., Ex. 28.)

As with his first motion for relief from judgment, the Superior Court transferred petitioner's second motion to the Washington Court of Appeals for consideration as a personal restraint petition and the Court of Appeals, in turn, transferred the petition to the Washington

REPORT AND RECOMMENDATION
PAGE - 8

Supreme Court. (*Id*., Exs. 30, 31.) The Supreme Court dismissed the petition on September 6, 2017. (*Id*., Ex. 32.) Petitioner thereafter moved for reconsideration of that ruling. (*Id*., Ex. 33.) The Supreme Court construed petitioner's motion for reconsideration as a motion to modify, and denied the motion on November 8, 2017. (*Id*., Ex. 34, 36.) The Supreme Court issued a certificate of finality on December 28, 2017. (*Id*., Ex. 37.)

On December 15, 2017, petitioner submitted to this Court for consideration his original petition for writ of habeas corpus under 28 U.S.C. § 2254. (*See* Dkts. 1, 4.) Because petitioner failed to clearly identify in his petition the grounds upon which he was seeking relief from his conviction, or the federal constitutional basis for each of those grounds, the Court, on January 4, 2018, issued an Order declining to serve the petition and granting petitioner leave to file an amended petition. (Dkt. 6.) The Court explained therein what petitioner would need to do in order to properly present his grounds for relief, and granted him thirty days to file his amended petition. (*Id*.)

On January 11, 2018, petitioner filed an amended petition which was only marginally better than his original petition, despite the guidance offered by the Court in its Order granting petitioner leave to amend. (Dkt. 7.) Petitioner failed to identify in his amended petition the claims he was intending to present in his first and second grounds for relief, and he failed to identify any federal constitutional basis for his third ground for relief. (*See id*.) Only in his fourth ground for relief, in which petitioner asserted that the state was allowed to rely on the perjured testimony of the alleged victims of his crime at trial, in violation of his constitutional right to a fair trial, did petitioner assert any potentially viable federal habeas claim. (*See id*.)

Thus, on March 8, 2018, this Court issued an Order declining to serve petitioner's amended petition and granting him leave to file a second amended petition. (Dkt. 9.) The Court once again

REPORT AND RECOMMENDATION
PAGE - 9

explained the ways in which petitioner's claims were deficient, and the Court advised petitioner that if he failed to timely file a second amended petition, or to correct the noted deficiencies, the Court would direct service of petitioner's amended petition on respondent, but would call for a response only to petitioner's fourth ground for relief. (*See id.*) Petitioner failed to file a second amended petition and, thus, on April 12, 2018, this Court issued an Order directing service of petitioner's amended petition on respondent and directing an answer only to petitioner's fourth ground for relief. (Dkt. 10.) Respondent has filed an answer addressing petitioner's fourth ground for relief and petitioner has filed a response to respondent's answer. (*See* Dkts. 18, 21.) This matter is now ripe for review.

DISCUSSION

Grounds One, Two and Three

Petitioner, in his amended petition for writ of habeas corpus, does not specifically identify any claims in his first two grounds for relief but, instead, references a seven page exhibit (identified as Exhibit B5) which contains a narrative description of the events surrounding his crime and his court proceedings. Petitioner does not make clear in his amended petition the precise nature of any intended claims with respect to his first two grounds for relief, nor does he make clear the federal constitutional basis for any intended claims. Petitioner asserts in his third ground for relief that his conviction contradicts the declaration, report, and testimony of a forensics expert, though he fails again to identify any federal constitutional basis for his claim.

A federal court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Federal habeas relief does not lie for errors of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)(citing

REPORT AND RECOMMENDATION
PAGE - 10

*Pulley v. Harris*, 465 U.S. 37, 41 (1984)).  The concern of the federal court in conducting habeas review is deciding whether a petitioner has suffered a violation of his federal constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Because petitioner fails to identify any specific claims in his first two grounds for relief, and because he fails to identify the federal constitutional basis for any claims he intends to assert in his first three grounds for relief, none of petitioner's first three grounds for relief are cognizable in this federal habeas action.  Petitioner's federal habeas petition must therefore be dismissed with respect to his first, second, and third grounds for relief.

<u>Ground Four</u>

Petitioner asserts in his fourth ground for relief that the state was allowed to rely on perjured testimony of the alleged victims of his crime, in violation of his constitutional right to a fair trial. Respondent concedes in his answer to the amended petition that petitioner appears to have properly exhausted his state court remedies with respect to this claim but fairly presenting the claim to the Washington Supreme Court as a federal claim. (Dkt. 18 at 9.)  The Court will therefore address the merits of the claim.

*1.   Standard of Review*

A petition for federal habeas relief may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See Williams*, 529 U.S. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

///

## 2. *Presentation of Perjured Testimony*

It is well established that a conviction obtained by the knowing use of false evidence is fundamentally unfair, and that such a conviction may not stand under the Fourteenth Amendment if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 269-71 (1950). *See also*, *United States v. Agurs*, 427 U.S. 97, 103 (1976). The presentation of inconsistent or contradictory testimony is not sufficient to establish that a prosecutor knowingly presented false testimony. *See United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1992), *United States v. Necoechea,* 986 F.2d 1273, 1280 (9th Cir. 1993). Moreover, the Supreme Court has made clear that habeas relief may be granted only if an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The Washington Supreme Court rejected petitioner's claim that the prosecution knowingly presented false evidence in petitioner's third personal restraint proceeding. The Court explained its reasoning as follows:

> Mr. Pollock primarily rests his case on his conclusory allegation that the prosecutor knowingly presented false testimony. But in support he mainly cites to a motion to dismiss filed by counsel in trial court, in which counsel argued that Ms. Lain's and Mr. Greer's stories were not supported by the physical evidence gathered by police at the scene. These bare arguments are not evidence that the State knowingly presented false testimony. And while the transcript shows that the State's witnesses were sometimes inconsistent, that fact is distinct from the State knowingly presenting false evidence. The due process clause of the Fourteenth Amendment to the United States Constitution imposes on prosecutors a duty not to introduce perjured testimony or use evidence known to be false to convict a defendant. *State v. Finnegan*, 6 Wn. App. 612, 616, 495 P.2d 674 (1972). This duty requires the prosecutor to correct state witnesses who testify falsely. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). To succeed on his claim that the prosecutor used false evidence to convict him, Mr. Pollock must show (1) that the testimony or evidence was actually false, (2) that the prosecutor knew or should have known that the testimony was actually false, and (3) that the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th

Cir. 2003). Although Mr. Pollock identifies some contradictions in the evidence regarding the shootout, he provides no factual evidence that the State knowingly presented false testimony.

(Dkt. 20, Ex. 32 at 3-4.)

Petitioner fails to demonstrate that this decision of the state court was contrary to, or constitutes an unreasonable application of, United States Supreme Court precedent. The state court correctly identified the applicable standard and reasonably concluded that petitioner had provided no evidence that the State knowingly presented false testimony. As in his state court proceedings, petitioner here relies primarily on the pre-trial motion to dismiss filed by defense counsel to support his claim. In his response to respondent's answer, petitioner cites to numerous excerpts from the trial transcript which he believes reveal contradictions or inconsistencies in the evidence and therefore support his assertion that the state was permitted to rely on perjured testimony. (*See* Dkt. 21 at 7-17.) This Court's review of the trial transcript confirms that there were contradictions in the testimony regarding where, and how, the shootout occurred. However, as noted above, the presentation of inconsistent or contradictory testimony is not sufficient to establish that a prosecutor knowingly presented false testimony. There is simply no evidence in the record that the prosecutor acted improperly in his presentation of the state's evidence. Accordingly, petitioner's federal habeas petition should be denied with respect to his fourth ground for relief.

## Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

REPORT AND RECOMMENDATION
PAGE - 14

district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability in this matter.

Motion for Appointment of Counsel

Petitioner has requested that counsel be appointed to represent him in this matter.  (Dkt. 16.)  He asserts in his motion that he does not understand how to file his grounds for relief in an appropriate format and that he is not competent to use the prison law library at the Monroe Correctional Complex.  (*See id.*)

The Court first notes that petitioner did not sign his motion for appointment of counsel. Rule 11(a) of the Federal Rules of Civil Procedure requires that every motion be signed by the party presenting it, and provides that any unsigned document must be stricken unless the omission of the signature is promptly corrected.  Though this is a deficiency which could be easily corrected by petitioner, it would serve no purpose to return the motion to petitioner for correction as the motion does not demonstrate that petitioner is entitled to appointment of counsel.

There is no right to have counsel appointed in cases brought under 28 U.S.C. § 2254 unless an evidentiary hearing is required.  *See Terravona v. Kincheloe*, 852 F.2d 424, 429 (9th Cir. 1988); *Brown v. Vasquez*, 952 F.2d 1164, 1168 (9th Cir. 1992); and Rule 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts.  The Court may exercise its discretion to appoint counsel for a financially eligible individual where the "interests of justice so require."  18 U.S.C. § 3006A.

The record before this Court makes clear that an evidentiary hearing is not required in this matter and, thus, that petitioner is not entitled to appointment of counsel.  Petitioner also fails to

REPORT AND RECOMMENDATION
PAGE - 15

demonstrate that the interests of justice require appointment of counsel. While petitioner asserts that he does not understand how to properly present his claims for relief, the Court provided him clear guidance on how to accomplish this task and gave him two opportunities to do so. The Court notes as well that petitioner demonstrated an ability to clearly identify his claims in his proceedings before the state courts which belies his assertion that he is incapable of doing so here. To the extent petitioner asserts he is not competent to use the law library at his place of confinement, his assertion is conclusory and therefore insufficient to justify the appointment of counsel. For these reasons, petitioner's motion for appointment of counsel should be denied.

## CONCLUSION

Based on the foregoing, this Court recommends that petitioner's amended petition for writ of habeas corpus be denied and this action be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied. Finally, this Court recommends that petitioner's motion for appointment of counsel be denied. A proposed order accompanies this Report and Recommendation.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect the right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

/ / /

/ / /

ready for consideration by the District Judge on **October 19, 2018**.

DATED this 21st day of September, 2018.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 17